**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **WELLINGTON RESOURCE GROUP LLC** : : : **Plaintiff,** : : v. : : **BECK ENERGY CORPORATION,** : : **Defendant.** : | Case No. 2:12-CV-104 JUDGE ALGENON L. MARBLEY Magistrate Judge Elizabeth P. Deavers |

**OPINION & ORDER**

## I. INTRODUCTION

This matter is before the Court on Intervenor-Plaintiff Marcellus Shale Land Acquisition Group's ("MSLAG") Motion to Dismiss the Cross-Complaint by Transact International, LLC ("Transact"). (Doc. 128). Pursuant to Fed. R. Civ. P. 12(b)(6), MSLAG moves to dismiss Transact's three causes of action. For the reasons stated herein, MSLAG's Motion to Dismiss is hereby **GRANTED**.

## II. PROCEDURAL POSTURE

This case originated with a suit brought in diversity jurisdiction by Plaintiff and Third-Party Defendant Wellington Resource Group, LLC ("Wellington"), against Defendant and Third-Party Plaintiff Beck Energy Corporation ("Beck"), alleging breach of contract and unjust enrichment / quantum meruit. Shortly after the case began, Transact sought and was granted leave to intervene, and filed claims against both Wellington and Beck. Beck now asserts counterclaims against Wellington, as well as third-party claims against individuals associated with Wellington, and Third-Party Defendants Michael Sahadi, Richard Hoffman, Dom Meffe, and Levencrest Consulting, Inc.

On November 27, 2012, MSLAG, a firm based in Pittsburgh, Pennsylvania, which sells, purchases, and markets assets in the oil and gas development industry, sought and was granted leave to intervene, and on January 3, 2013, filed various claims against Beck (Doc. 100). Transact then filed

cross-claims against MSLAG (Doc. 116).  Beck first moved to dismiss the claims against it by Transaction (Doc. 76), which the Court granted in part and denied in part (Doc. 149).  Beck then moved to dismiss the claims brought against it by MSLAG (Doc. 113), which the Court denied (Doc. 150).

Now, MSLAG has moved to dismiss the cross-claims brought by Transact.  (Doc. 128).  The matter has been fully briefed, and is ripe for review.

## III. STATEMENT OF FACTS

Given the number of parties involved, as well as the voluminous filings, multiple competing versions of the events of this case have been presented to the Court.  For the purposes of this Motion to Dismiss, however, the Court accepts as true the facts as pleaded by non-movant Transact in its Cross-Complaint (Doc. 116).

Transact is a mergers and acquisitions brokerage and advisory firm based in Raleigh, North Carolina, whose principal is Brian J. Reilly, an attorney.  (*Transact Cross-Complaint*, Doc. 116, ¶ 6).  In 2010, Reilly met with Domenic Meffe and Richard Hoffman, principals at Wellington, regarding potential business opportunities related to oil and gas transactions in Ohio.  (*Id.*, ¶ 7).  In January 2011, Wellington began discussions regarding Beck, Wellington's client, hoping to engage Transact to assist in Wellington's marketing of Beck's oil and gas leases (the "Beck Assets").  (*Id.*, ¶ 8).  Transact asked for written proof of Wellington's agreement with Beck, and Wellington represented that it had such a writing; thus, on January 31, 2011, Transact and Wellington executed a co-brokerage agreement, providing that Transact would be paid 2% of the total transaction price, if it were successful in finding a ready and able purchaser of the Beck Assets.  (*Id.*, ¶¶ 9-10).  Wellington in fact reduced its arrangement with Beck to writing on February 28, 2011, whereby Wellington would receive a total of 5% of the purchase price if it could provide a buyer for the Beck Assets.  (*Id.*, ¶ 11).

Transact began marketing the Beck Assets, undertaking research and phone calls with various firms.  (*Id.*, ¶ 12).  In particular, Transact set up a meeting between Eclipse Energy, a Pennsylvania

company, and Beck.  (*Id.*).  That meeting did not result in a sale; during the negotiations, however, Reilly met personally with Raymond Beck, principal of Beck Energy.  (*Id.*).

Transact continued to market the Beck Assets, and eventually, on April 15, 2011, spoke with Donna Mullen of XTO Energy, Inc. ("XTO"), a subsidiary of Exxon Mobil.  Through Mullen, Reilly spoke to Virginia Markley, a senior representative of XTO.  (*Id.*, ¶ 13).  Reilly communicated with Markley several times throughout April and May 2011, and, on June 9, 2011, emailed with her, referencing these prior conversations.  (*Id.*, ¶ 14).  Markley expressed interest in the Beck Assets, and the pair communicated throughout June and into July 2011.  (*Id.*).  In particular, on July 9, 2011, Reilly emailed with Markley, and confirmed that Transact and Wellington were the only groups authorized to market the Beck Assets to third parties.  (*Id.*, ¶ 22).  Ultimately, Reilly set up a phone call between Markley and Meffe, of Wellington, on July 11, 2011.  (*Id.*, ¶ 15).  In late July and early August 2011, Markley further emailed Reilly regarding XTO's interest in the Beck Assets.  (*Id.*).  During this time, Markley made no mention of MSLAG.  (*Id.*, ¶ 23).  Indeed, according to Transact, MSLAG had no involvement in marketing the Beck assets whatsoever, and at least through the beginning of August 2011, Transact had never even heard mention of MSLAG.  (*Id.*, ¶¶ 21-23).

On August 5, however, Markley communicated directly to Meffe that she wanted to be sure that RJ Marino of MSLAG received credit for the deal.  (*Id.*, ¶ 24).  Transact alleges that sometime in late July 2011, MSLAG had received information from sources within XTO that the Beck Assets were being considered, and MSLAG had begun inserting itself into the deal, calling and meeting with Wellington representatives.  (*Id.*, ¶ 25).  MSLAG alleges that it contacted Markley about the Beck Assets as early as May 4, 2011, at which time Markley made no mention of Transaction or Reilly.  (*Id.*, ¶ 22; *see also MSLAG Complaint*, Doc. 100, ¶¶ 17-18).  In any case, on August 5, principals of Wellington informed Reilly that MSLAG had threatened to "kill the meeting" if it were not given credit for the introduction.  (*Id.*, ¶ 25).  In addition, around that time, MSLAG sent a draft fee-sharing agreement to Wellington, and

3

asked for proof of an agreement between Wellington and Beck.  This request indicates, according to Transact, that MSLAG was only newly aware of the Beck/XTO negotiations.  (*Id.*).

Wellington initially supported Transact as the party responsible for making the connection with XTO.  (*Id.*, ¶ 26).  By August 9, however, MSLAG and Wellington had signed a fee-sharing agreement relating to the sale of the Beck Assets.  (*Id.*, ¶ 27; *see also MSLAG Complaint*, Doc. 100, ¶ 21).  A previous confidentiality agreement was in place between MSLAG and Wellington dating from May 2011.  (*Id.*; *see also MSLAG Complaint*, ¶ 20).

On September 12, 2011, XTO made a written offer to purchase the Beck Assets, and on or about November 9, XTO and Beck executed a Purchase and Sale Agreement.  (*Id.*, ¶ 16).  MSLAG admits, in its Complaint, that once XTO and Beck were brought together, MSLAG had no further participation in, or control over, the negotiations.  (*MSLAG Complaint*, Doc. 100, ¶ 25).  Around December 20, Beck executed two assignments and bills of sale.  (*Transact Cross-Complaint*, Doc. 116, ¶ 16).  The total purchase price was $84,961,346.  However, when Transact requested an accounting from Wellington, Meffe informed Reilly that Beck refused to pay Wellington its commission.  (*Id.*, ¶ 17).  Subsequently, Wellington stated it would not pay any fee to Transact.  (*Id.*, ¶ 30).  Wellington has also refused to pay MSLAG any fee that might be owed to it.  (*MSLAG Complaint*, Doc. 100, ¶ 29).

On February 15, 2012, Transact learned that Wellington had filed this action, (*Transact Cross-Complaint*, Doc. 116, ¶ 17), and it filed its first Intervenor Complaint on July 23 (Doc. 46).  MSLAG moved to intervene on November 27, 2012 (Doc. 90), and Transact filed its cross-complaint against MSLAG on February 20, 2013 (Doc. 116).  Transact asserts claims for tortious interference with a contract (Count I), tortious interference with prospective business relations (Count II), and conspiracy (Count III), under Ohio law.  On March 26, MSLAG moved to dismiss all claims against it brought by Transact.  (Doc. 128).

## IV.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows for a case to be dismissed for "failure to state a claim upon which relief can be granted." Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005). Thus, the Court must construe the complaint in the light most favorable to the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). The Court is not required, however, to accept as true mere legal conclusions unsupported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). Although liberal, Rule 12(b)(6) requires more than bare assertions of legal conclusions. *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citation omitted). Rather, the complaint must "'give the defendant fair notice of what the claim is, and the grounds upon which it rests.'" *Nader v. Blackwell*, 545 F.3d 459, 470 (6th Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). In short, a complaint's factual allegations "must be enough to raise a right to relief about the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## V.   ANALYSIS

MSLAG argues that all three of Transact's counts fail as a matter of law. First, MSLAG asserts that Transact's tortious interference counts cannot succeed, because Transact has failed to allege that: (1) MSLAG "interfered"; (2) MSLAG's conduct was "intentional" or "improper"; and (3) MSLAG had no justification or privilege for its conduct. (Doc. 128 at 7-16). In addition, MSLAG argues that Transact has failed to state a claim for conspiracy, because Transact has not pleaded its claim with sufficient specificity, and because it fails to allege any cognizable independent unlawful act. (*Id.* at 16-18).

### A.   Tortious Interference with a Contract

In order to recover for a claim of tortious interference with a contract, a plaintiff must prove "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Kenty v.*

*Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995); *see also Crown Equip. Corp. v. Toyota Material Handling, U.S.A., Inc.*, 202 F. App'x 108, 111 (6th Cir. 2006).

MSLAG challenges the sufficiency of Transact's allegations with regard to factors (3) and (4), and argues that it did not "interfere," that its conduct was neither "improper" nor "intentional," and that it had justification for its actions.

MSLAG first argues that it did not interfere with any contract or business relationship, because it did not cause any other person or entity to "terminate[], or decide[] not to enter into, relationships with [Plaintiff] as a result of [its] actions." *Wilkey v. Hull*, 366 F. App'x 634, 638 (6th Cir. 2010).  MSLAG asserts that Transact does not, and cannot, allege any facts permitting the reasonable inference that Wellington's decision to enter into a fee-sharing agreement with MSLAG "caused" an interference with Wellington's contract with Transact.  Instead, insists MSLAG, "Transact's Complaint resorts to pure speculation."  (Doc. 128 at 8).

In its Response, Transact retorts that it has set forth allegations that "MSLAG intimidated Plaintiff [Wellington] into signing a co-brokerage agreement relating to the Beck Energy deal . . . in order to 'squeeze out' Transact from the deal."  (Doc. 131 at 1).  Transact further argues that it will prove, through discovery, "that MSLAG used past relationship(s) with certain employee[s] of XTO . . . to conspire to replace Transact as the procuring cause of XTO as a buyer of the Beck assets."  (*Id.* at 2).  Transact concludes that, if the Court "indulge[s] all reasonable inferences that might be drawn from the pleading," as it should on a motion to dismiss, it has met its burden under the Federal Rules.  (*Id.* at 4).

In Transact's Cross-Complaint, Transact alleges that Markley, of XTO, first mentioned MSLAG on August 5, 2011, when she stated that she "wanted RJ Marino of MSLAG to 'get credit for the deal,'" and threatened to "kill the meeting" if MSLAG were not given credit. (*Transact Cross-Complaint*, Doc. 116, ¶¶ 24-25).  Transact further claims that MSLAG "induced Wellington into signing a fee sharing agreement for the Beck Transaction" on August 9.  (*Id.*, ¶ 27).  After this point, according to Transact,

"MSLAG appears to have done little or nothing on the transaction as evidence [sic] by the total lack of evidence in its Complaint from August 2011 to the transaction closing in December 2011." (*Id.*, ¶ 29).

As explained by Transact, after the close of the transaction, Beck "decided to ignore the procuring cause and retain an $85,000,000 windfall." (*Id.*, ¶ 30). Immediately afterward, and on account of MSLAG's interference, Wellington was "left . . . with a fractional percentage fee out of the agreed upon 5%, [and therefore] decided to hire counsel and inform Transact that it would not be paying the agreed upon fee to Transact." (*Id.*). Moreover, "due to the MSLAG interference, Wellington declined a 3% settlement offer from Beck as it stood to gain nothing after agreeing to pay Transact 2% and MSLAG 2.5%." (*Id.*). According to Transact's previous pleadings, it was not until January 2012 that Wellington informed Transact that it would not pay. (*Transact First Amended Intervenor Complaint*, Doc. 61, ¶ 28). At that time, Wellington, through Meffe, told Reilly and Transact that "deals change," and therefore "Transact would not be paid as agreed in their contract." (*Id.*). In a letter dated February 9, 2012, Wellington informed Transact that it "did not consider Transact's claim 'valid,'" and instead merely "invited Transact to submit a demand for some 'nominal' sum." (*Id.*).[1]

Transact has failed to plead a claim for tortious interference in a contract. Even if the Court indulges all reasonable inferences in its favor, Transact has not pleaded facts that can demonstrate that MSLAG "interfered" with its contract with Wellington. As Transact has admitted, Beck's failure to pay Wellington was the cause of Wellington's refusal to pay Transact. Transact's claim that Wellington assessed the .5% it would retain after paying MSLAG and Transact both, and the resultant decision to breach, is rank speculation, supported by no plausible factual allegations. *See Twombly*, 550 U.S. at 555 (a complaint's allegations "must be enough to raise a right to relief above the speculative level."); *see also*

---

[1] On a motion to dismiss, a court "may consider the complaint and any exhibits attached thereto, public records, *items appearing in the record of the case* and exhibits attached to the motion to dismiss so long as they are referred to in the Complaint and central to the claims contained therein." *Bassett v. Nat'l Collegiate Ass'n*, 528 F.3d 426, 430 (6th Cir.2008) (emphasis supplied). Importantly, "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*, 604 F. Supp. 2d 1128, 1157 (S.D. Ohio 2009) (quoting *In re Livent, Inc. Noteholders Secs. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001)).

*Wilkey*, 366 F. App'x at 638 (plaintiff's "vague assertion of interference" is just a "'legal conclusion' that is itself entitled to no weight.") (citing *Iqbal*, 556 U.S. at 678).

Moreover, even if Wellington *did* conduct such an internal calculus, and determined that, rather than pay both Transact and MSLAG and accept the remaining .5% as its compensation, it should breach its contract with Transact, Transact has still failed to prove that MSLAG's actions "caused" Wellington's breach.  Ohio law requires "the wrongdoer's *intentional procurement* of the contract's breach," *Kenty*, 650 N.E. 2d at 866 (emphasis supplied), meaning that the wrongdoer's conduct "causes the third party to breach the contract, or . . . leaves the third party with no choice but to breach the contract," *Union of Needletraders, Indus. and Textile Employees AFL-CIO v. American Capital Strategies, Ltd.*, 546 F. Supp. 2d 546, 560-61 (S.D. Ohio 2008).  "Intentional" means that the actor must "desire to cause a breach of contract, or know that breach of contract is substantially certain to result from the interference."  *Id.*

Transact has pleaded no such facts.  Although it might have been less desirable for Wellington, when considering its profits, to split its fee with both Transact and MSLAG, and it therefore ended its contract with Transact, this is not the "intentional procurement" of breach required by Ohio law.  It is merely a business decision.  The fact that MSLAG threatened to "kill" the meeting between XTO and Beck has no bearing on Transact's contract with Wellington.  Transact and Wellington contracted to search for a buyer – Transact has not alleged how MSLAG's interference in the XTO negotiations "caused" Wellington to breach this contract.  While Wellington's actions may be consistent with Transact's retelling, its conduct is also "as much in line with a wide swath of rational and competitive business strategy." *Twombly*, 550 U.S. at 554.  More is required.  *See also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (internal quotation omitted).

8

## B. Tortious Interference with Prospective Business Relations

To plead a claim for tortious interference with a business relationship, a plaintiff must establish: "(1) a business relationship, (2) the tortfeasor's knowledge thereof, (3) an international interference causing a breach or termination of the relationship, and (4) damages resulting therefrom." *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 774 N.E.2d 775, 780 (Ohio Ct. App. 2002). The main difference between this claim and tortious interference with a contract is that interference with a business relationship "includes intentional interference with prospective contractual relations, not yet reduced to a contract." *Id.* at 781. In order to succeed, a plaintiff "must establish that the acts of the defendant caused a third party not to enter into a contract with the plaintiff." *McLaurin v. Fischer*, 768 F.2d 98, 105 (6th Cir. 1985) (internal citation omitted). The interference must be intentional, "because Ohio does not recognize negligent interference with a business relationship." *Diamond Wine*, 744 N.E.2d at 781.

MSLAG here argues that Transact has failed to articulate any severed prospective contractual relationships which could have fallen victim to MSLAG's machinations. (Doc. 128 at 9). Instead, insists MSLAG, Transact has merely offered the bald conclusions that MSLAG "claimed a fee" on a previously consummated transaction between XTO and Wellington, without more, and that MSLAG "interfered" in some way with certain undefined "transaction relationship[s] between Wellington and Transact." (*Id.* at 9-10) (citing *Transact Cross-Complaint*, Doc. 116, ¶¶ 36, 38).

Transact's Response does not specifically address MSLAG's arguments. In its Cross-Complaint, Transact alleges that discovery "has revealed a vast array of evidence" showing that Transact and Wellington engaged in "numerous . . . transactions unrelated to the Beck Assets." (Doc. 116, ¶ 35). Transact further alleges that, the day prior to the Beck closing, XTO also closed with Wellington on a second transaction (the "Massey Transaction"), from which MSLAG also claimed a percentage fee. (*Id.*, ¶ 36). Due to MSLAG's interference, "Wellington has refused to honor the one third fee split due to Transact," and, furthermore, "all transactions and closing between Wellington and Transact has ceased since the Beck closing and the MSLAG interference." (*Id.*). Transact further insists that MLSAG "acted

with clear malice toward Transact" and that it "intentionally interfered with multiple transactions between Wellington and Transact, directly intimidating Wellington and using other improper means," with the purpose to "prevent Transact from acquiring or continuing the prospective business relationship between Transact and Wellington." (*Id.*, ¶ 37). This interference, concludes Transact, "has severed a multiple transaction relationship between Wellington and Transact." (*Id.*, ¶ 38).

To the extent that Transact's allegations relate to unspecified "transactions" between itself and Wellington, its arguments fall woefully short of the requirements of Fed. R. Civ. P. 8(a). Transact makes vague reference to "numerous [other] transactions unrelated to the Beck Assets" and "a multiple transaction relationship between Wellington and Transact," (Doc. 116, ¶¶ 35, 38), without anything more. This is not enough. The "vague assertion" that MSLAG "interfered with certain unspecified business relationships" is "just a legal conclusion that is itself entitled to no weight." *Wilkey*, 3667 F. App'x at 638 (affirming dismissal where plaintiff failed to allege any specific contracts terminated, or not entered into, as a result of defendant's actions).

With regard to the one transaction alleged with any detail, the Massey Transaction, Transact still misses the mark. Reading Transact's Cross-Complaint in the most favorable light, Wellington and Transact appear to have had some sort of agreement related to the Massey Transaction, which closed one day prior to the closing of the Beck Transaction. (Doc. 116, ¶¶ 35-36). Despite the closing, Wellington has refused to honor the one-third fee split. (*Id.*, ¶ 36). Transact does not explain further. This is not enough. While Transact has described a business relationship, it has failed to allege what, if any, MSLAG knew of the relationship, *how* MSLAG interfered with it, and in what way the interference was intentional or improper. The Court will not engage in speculation and supposition to fill the gaps in the barest sketch of a cause of action. A Complaint that "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 556 U.S. at 678 (internal quotation omitted).

## C. Conspiracy

Finally, MSLAG challenges Transact's claim for civil conspiracy.  Under Ohio law, civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *AAA Installers v. Sears Holding Corp.*, 764 F. Supp. 2d 931, 941 (S.D. Ohio 2011).  Thus, a plaintiff must establish the following elements:  "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 534 (6th Cir. 2000) (quoting *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 90 629 N.E.2d 28, 33 (Ohio 1993)).

MSLAG argues that Transact has failed to allege an underlying unlawful act.  MSLAG also argues that Transact has not pleaded its conspiracy claim with the specificity required under Ohio law.  (Doc. 128 at 17).  Transact's conspiracy allegations assert that R.J. Marino, a principal of MSLAG, was a prior employee of XTO, and that he "improperly used this prior relationship" to gain knowledge of the XTO-Beck transaction.  (Doc. 116, ¶ 40).  Transact further alleges that someone from MSLAG contacted Markley at XTO and requested that she insert a claim for brokerage fees for MSLAG from Wellington, and that together they would "disrupt the Beck transaction to the benefit of MSLAG," to which Markley agreed.  (*Id.*, ¶ 41).  Transact alleges that Markley took an overt action by insisting to Wellington that it recognize MSLAG as the procuring broker of the Beck transaction, and that MSLAG took an overt action by requiring Wellington to execute a fee-sharing agreement regarding the same.  (*Id.*, ¶¶ 42-43).

MSLAG is correct that Transact has failed in its allegations.  "An underlying unlawful act is required before a civil conspiracy claim can succeed." *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998).  As the Court has already dismissed Transact's other claims, its conspiracy count cannot survive.  While MSLAG's agreement with Markley, if true, may have been inappropriate, Transact has not articulated a legal wrong.  An agreement between Markley and MSLAG to insist that MSLAG be given credit for the XTO-Beck transaction is not unlawful, however much it may be immoral or bad

11

business practices. Wellington was free to accept or reject MSLAG's claim as the procuring cause, and its decision to do so does not give rise to a cause of action by Transact against MSLAG, even under the factual scenario pleaded here. Transact's claim for civil conspiracy cannot survive.

## VI. CONCLUSION

For the foregoing reasons, MSLAG's Motion to Dismiss (Doc. 128) is hereby **GRANTED**.

**IT IS SO ORDERED.**

                                             /s/ Algenon L. Marbley
                                             **ALGENON L. MARBLEY**
                                             **UNITED STATES DISTRICT JUDGE**

**DATED: November 25, 2013**